MAYFAIR CONSTRUCTION COMPANY, Plaintiff-Appellee and Cross-Appellant, v. WAVELAND ASSOCIATES PHASE I LIMITED PARTNERSHIP, Defendant-Appellant and Cross-Appellee.

First District (6th Division) No. 1—91—4056

Opinion filed May 14, 1993.—Modified on denial of
rehearing August 20, 1993.

Lee A. Freeman, Jr., James T. Malysiak, Albert F. Ettinger, and Robert P. Scales, all of Freeman, Freeman & Salzman, P.C., of Chicago, for appellant.

Michael R. Feagley and James C. Schroeder, both of Mayer, Brown & Platt, and Lawrence A. Rosen, of Lawrence, Kamin, Saunders & Uhlenhop, both of Chicago, for appellee.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Waveland Associates Phase I Limited Partnership, is appealing from an order of the trial court declaring that Waveland materially breached its contract with plaintiff, Mayfair Construction Company, by refusing to submit disputes initially to the project architect for determination prior to litigating them in the circuit court of Cook County. As a result of this breach, the trial court in its order precluded Waveland from raising any defenses or affirmative defenses to claims raised by Mayfair which were subject to being decided by the architect. The trial court's order was based on a jury's determination that, under the parties' contract, Waveland was required to submit disputes initially to the architect and that its failure to do so was a material breach. Waveland also appeals from these jury findings.

Waveland raises several issues on appeal. Initially, it contends that the jury's factual findings are erroneous and that the trial court's order barring it from raising any defenses or affirmative defenses to Mayfair's claims is legally unprecedented and unjustified. It also contends that the trial court erred by: (1) refusing to instruct the jury as to the legal meaning of "material breach"; (2) refusing to allow the issue of Mayfair's own alleged contract breach to be raised at trial, precluding all evidence relating to it, and then issuing an order finding that Mayfair had substantially performed its contract obligations; (3) allowing the Mayfair attorney who negotiated the contract to testify at length, while precluding Waveland's attorney who negotiated

the contract from testifying on the same points; (4) making certain factual findings, and incorporating them into its order, that the jury was not asked to and did not resolve; and (5) denying Waveland's motion to dismiss this declaratory judgment action on the grounds that Mayfair was really seeking an advisory opinion and had waived the only viable remedy, *i.e.*, an order requiring disputes to be submitted to the architect.

Mayfair has filed a cross-appeal, contending that, in addition to barring Waveland from raising any defenses to Mayfair's claims, the trial court should have also barred Waveland from raising any claims against Mayfair that were to have been initially decided by the architect.

This cause arises from the construction of a real estate project known as the New York Apartments located at 3660 North Lake Shore Drive in Chicago (the project). The project consisted of the construction of two buildings—a high-rise apartment building and an associated low-rise commercial building. After extensive negotiations, on November 19, 1985, Mayfair and Waveland entered into a construction contract under which Mayfair agreed to serve as general contractor for the project, of which Waveland was the owner. Throughout the contract negotiations, Mayfair sought to include in the contract a method for a neutral third party to resolve disputes between the parties. The principals of Mayfair and Waveland participated in six or seven negotiation meetings; their lawyers (Howard Kamin for Mayfair and Paul Lurie for Waveland) met on many other occasions and had numerous phone conversations during which the construction contract was discussed.

The construction contract consisted principally of two parts, the owner-contractor agreement and the general conditions. According to Waveland, article 17 of the owner-contractor agreement was the key dispute-resolution provision. In pertinent part, article 17 provides:

> "17.1—No decision of the Architect, Construction Manager, Owner, Contractor, or Lender hereunder which is disputed shall be final; and any such decision shall be subject to determination through litigation.
>
> 17.2—Any dispute between Owner and Contractor hereunder may be litigated in the Circuit Court of Cook County, Illinois and the parties hereunder agree, and shall cause all parties in privity with them to agree to jurisdiction in such Court and that all discovery in such proceeding shall be completed within 90 days of the filing of the initial complaint therein and that

the parties shall jointly apply to such Court for a trial thereon within 150 days of such filing."

According to Mayfair, articles 2.2.14, 2.2.15, and 2.2.16 of the general conditions represent the pivotal dispute-resolution provisions. Article 2.2.14 provides:

"2.2.14—The Architect will be the interpreter of the requirements of the Contract Documents and the initial judge of the performance thereunder by both the Owner and Contractor."

Article 2.2.15 states:

"Claims, disputes and other matters in question between the Contractor and the Owner relating to the execution or progress of the Work or the interpretation of the Contract Documents shall be referred initially to the Architect for decision which he will render in writing within a reasonable time. Such decision may be litigated by either party."

Finally, article 2.2.16 provides:

"All interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents[.] *** In his capacity as interpreter and judge, he will endeavor to secure faithful performance by both the Owner and Contractor, [and] will not show partiality to either[.]"

Construction on the project began on or about November 19, 1985, the date Mayfair and Waveland signed the construction contract. In February of that year, Waveland entered into a contract with the project architect; that contract specifically excluded a standard provision that would have required the architect to be the judge of performance on the project and to issue decisions on disputes arising between Waveland and Mayfair. The architect's contract was negotiated for Waveland by Waveland's principal and Lurie, the same people who later negotiated the Mayfair contract. Mayfair was not made aware that there was any conflict between the two contracts with respect to the method of resolving disputes until very late in the negotiations, and when Kamin pointed out the conflict to Lurie, according to Kamin, Lurie told him that the architect would in fact be required to decide disputes. Throughout the period of negotiations between Waveland and Mayfair, the architect pointed out to Waveland that there were significant conflicts between the construction contract and the architect's contract, most importantly that the architect's decision-making role in the construction contract was not contemplated in the architect's contract.

Under the terms of the construction contract, construction work on the project was to be substantially completed by September 18, 1987, unless the time of performance was extended by a change order. For every day after that date on which the project was not substantially completed, Mayfair was to pay Waveland $18,169 in liquidated damages. Mayfair was to be paid a bonus of $9,698 for each day the project was substantially completed before August 4, 1987. In addition, if any work was suspended by the owner for more than six months, Mayfair was entitled under the construction contract to renegotiate the price for that work or refuse to do it.

During the course of the project, disputes arose between Mayfair and Waveland regarding a number of issues, including Mayfair's requests for schedule extensions and cost increases. As each of the parties' disputes arose, Mayfair informed the architect and Waveland's construction manager of the nature and substance of the dispute. When it became apparent that the parties were unable to reach an agreement as to the matters at issue, specifically with regard to construction of the commercial building, on April 1, 1987, Mayfair wrote to the architect asking him to resolve the disputes between Mayfair and Waveland concerning time extensions and change orders, as provided for in the construction contract. Mayfair's executive vice-president, Angelo Polvere, testified that he wrote the letter to the architect at that time because Mayfair was approaching the end of its job on the project with matters still unresolved and also because Mayfair's relationship with Waveland was deteriorating. (During the first 13 months of construction, disputes which arose between Mayfair and Waveland did not result in formal written requests to the architect for a decision. Paul Cocose, Mayfair's president, testified that he viewed dispute resolution by the architect as a last resort and considered that the better way of resolving disputes was by negotiating with Waveland.)

Having received no reply to the April 1 letter, Mayfair followed up with another letter a week later. On April 10, the architect responded by indicating that under the *owner-architect* contract, he was not authorized to resolve disputes between the owner and contractor. Subsequently, Mayfair and the architect entered into discussions, through their respective counsel, concerning the architect's authority pursuant to article 8.3.1 of the general conditions of the construction contract to determine whether Mayfair was entitled to its requested time extensions. In a letter to Waveland's president on April 30, 1987, the architect stated his "impression that it was your intention that the Architect not be the judge/interpreter in regard to time exten-

sions"; noted that Mayfair "think[s] otherwise"; and explained that the architect's attorney had concluded that under article 8.3.1 of the general conditions, the architect had the "responsibility for time decisions." As a result, the architect advised Mayfair that he would render such decisions.

Waveland's president wrote back immediately, expressing his disagreement with the architect's understanding of the construction contract and directing him to "withhold from taking any action on time extension delays" pending Waveland's review of the matter.

Later in May, the architect's attorney received a call from one of Waveland's attorneys. The attorney for Waveland stated that Waveland did not want the architect to make any decisions on the project and that if the architect made any decisions Waveland was going to sue him. Waveland's attorney put this directive in writing in a letter to the architect's attorney dated June 22, 1987. Waveland's attorney stated that provisions in the construction contract were "immaterial" because "the agreement between your client [the architect] and the owner precludes your client from acting in regard to disputes between the owner and the general contractor," and Waveland "has never authorized your client to act on disputes, claims, or change orders." The letter also informed the architect that if he ruled on any disputed issues, he would be in breach of his contract with Waveland, that Waveland would terminate its contract with the architect, and that Waveland would file suit against the architect for damages resulting from his interference with Waveland's contract with Mayfair. According to Mayfair, Waveland never sent it a copy of this letter.

In a letter dated July 7, 1987, counsel for the architect informed Mayfair that as a result of Waveland's letter threatening the architect with discharge and suit, he would not make any determinations with regard to any disputes between Mayfair and Waveland, including any and all disputes concerning extensions of time or additional compensation due to Mayfair as a result of changes in the work.

According to Mayfair, Waveland's refusal to let the architect decide any disputes had its most immediate impact on the commercial building. Although construction on the rest of the project began within days after the construction contract was signed in November 1985, work on the commercial building did not begin until May 1986. After only working on that building for two months, Waveland ordered Mayfair to stop all work on it because Waveland decided to redesign the building. During the period of September 1986 through April 1987, Waveland revised the design several times, and Mayfair told Waveland that the costs and time for completing the commercial

building would be increased as a result of these revisions and the delay occasioned thereby. Subsequently, Waveland abandoned its plan to redesign the building, and in July 1987 formally ordered Mayfair to renew work on the commercial building using the old design. Waveland and Mayfair, however, could not agree on a change order allowing Mayfair the increased costs caused by the delay or an extension of time to complete the project, and the architect refused to rule on either item because Waveland had told him not to. As a result, Mayfair did not complete the commercial building. According to Cocose, Mayfair had "no way of getting an equitable treatment on the additional costs" once Waveland "had taken that authority away from the architect." Instead, the work on the commercial building was finished by Mayfair's former subcontractors.

Between July 1987 and early 1988, Mayfair continued to work on the apartment tower and parking garage since both buildings were close to being finished and Waveland had not suspended work on either one. Mayfair ceased work on the project in early 1988 because in its view it had completed all work called for by the construction contract. Waveland, however, disagreed, and retained another contractor, James McHugh Construction Company, to complete the project. According to Mayfair, from 1985 until 1988, Mayfair was paid $30,624,531.83 under the construction contract; according to Waveland, the amount paid was approximately $32 million. Although the parties agree that the original contract price to be paid Mayfair was $33.8 million, Mayfair alleges that it is due approximately $8.5 million more as a result of extra costs it incurred while working on the project.

Once it became evident to Mayfair that the architect was not going to resolve any of the disputed issues, primarily involving the commercial building, on August 7, 1987, Mayfair filed this action in the Cook County chancery division seeking a declaration of the rights and obligations of the parties under the construction contract.

On January 20, 1988, Mayfair filed a motion for summary judgment. In that motion, Mayfair claimed that the construction contract clearly established that the architect was to be allowed to resolve disputes between Mayfair and Waveland as an initial matter. Mayfair asked the court to determine as a matter of law the meaning of the dispute-resolution provisions in the construction contract and to issue appropriate declarations spelling out the legal consequences of Waveland's refusal to comply with those provisions. The trial court denied Mayfair's motion for summary judgment on May 20, 1988, ruling that there was a disputed issue of material fact as to the parties' intent

with respect to submitting disputes to the architect for initial decision.

While the parties were briefing the summary judgment motion, the scope of the litigation quickly mushroomed. Waveland had not paid McHugh Construction Company, which replaced Mayfair for the work on the commercial building, and consequently, on or about March 16, 1988, McHugh filed a mechanic's lien action in the chancery division, naming as necessary defendants everyone who had possible liens against the project, including both Mayfair and Waveland. (James McHugh Construction Co. v. Midwest Bank & Trust Co., No. 88—CH—2449 (*McHugh*).) After the judge assigned to Mayfair's declaratory judgment action denied Mayfair's summary judgment motion, he transferred the case, by agreement of the parties, to the mechanics' lien section where the *McHugh* action was pending. Mayfair then responded to McHugh's complaint by filing a counterclaim, directed at Waveland, asserting its own lien rights in the amount of $7,040,980.17. All of the other parties involved in the project did the same. Waveland filed a counterclaim and sought damages from Mayfair in excess of $19 million for alleged construction defects and delay in completing the project; these claims were identical to those alleged by Waveland in a counterclaim filed in the declaratory judgment action. In its counterclaim, Waveland alleged that on numerous occasions it had notified the architect of various defects in Mayfair's work, and the architect in turn had notified Mayfair in writing that the work did not conform to contract requirements.

On April 19, 1988, Waveland filed a motion to reconsider a previously filed motion to dismiss Mayfair's declaratory judgment action on the ground that there was no longer a controversy between the parties as to prospective action that might be resolved by a judicial declaration, since by Mayfair's own admission it had completed all work required under the construction contract and thus was no longer a party to the contract in need of an interpretation of the dispute-resolution provisions. The court denied Waveland's motion. Waveland filed a similar motion on January 12, 1990, arguing in addition that the only proper remedy for Waveland's alleged breach of an agreement to refer disputes initially to the architect would have been a suit in July 1987 to compel arbitration of the disputes by the architect, and that Mayfair had waived this remedy by filing its declaratory judgment action. The court also denied this motion.

In November 1988, the declaratory judgment action was transferred to the law division because of Waveland's jury demand. The declaratory judgment case and the lien case maintained their separate

identities until the chancery judge, at the suggestion of the parties, formally consolidated the declaratory judgment case into the lien case. At that time, Mayfair explained to the judge that, if the declaratory judgment part of the consolidated case was tried first and the jury concluded that Waveland breached the contract by not permitting the architect to decide disputes, then Waveland's counterclaims against Mayfair might be barred altogether. The judge agreed that the declaratory judgment action involved the "crux" of the parties' dispute, and determined that the various subcontractors' claims also would be affected by an adjudication of the terms of the construction contract.

In order to facilitate resolution of the crux of the dispute, the judge subsequently severed the declaratory judgment claims from the construction defect and delay claims, and established a discovery cutoff so that the declaratory case could be tried quickly. In order to narrow the issues for trial, Mayfair amended its complaint and Waveland amended its counterclaims against Mayfair. The chancery judge then transferred the declaratory judgment claim to the law division for trial.

The case was set for trial in late May 1991. Because of a conflict of interest between Waveland's attorneys and the trial judge, which was not revealed by Waveland until the second day of trial, a mistrial was declared and a new judge was assigned. The new trial began in June 1991. Before the trial began, Waveland renewed its motion to dismiss. The trial judge, after considering the parties' arguments, concluded that nothing could be done in the case until the issue of contract interpretation was decided by a jury. Consequently, Waveland's motion was denied.

At the trial, Kamin, Mayfair's attorney, testified regarding face-to-face meetings and telephone conversations that he had with Lurie, the attorney who represented Waveland in the contract negotiations. Kamin testified that he and Lurie had negotiated the arrangement set forth in articles 2.2.14, 2.2.15 and 2.2.16 of the general conditions, and that the parties understood these articles to mean that any disputes that arose would have to be taken initially to the architect for decision, and that decision would be binding unless it was overturned in the circuit court of Cook County.

Waveland called Lurie to testify as to his recollection of the negotiations with Mayfair. He testified that between the summer of 1985 and November 19, 1985, he had 10 or more meetings and phone calls with Kamin but that he could not recall the exact dates of any such calls or meetings. He recalled "the gist" of discussions he had with Kamin at a meeting held between September 26 and September 30,

1985, but could not remember the exact date of the meeting, who was present, or how long the meeting lasted. Ruling on Mayfair's foundation objection, the court refused to allow Lurie to recount the discussion. When Waveland attempted to refresh Lurie's memory as to the details of the late September meeting with Lurie's billing records, the court sustained Mayfair's objection to the use of the billing records because Waveland had not produced them during pretrial discovery when requested by Mayfair to do so. Waveland made an offer of proof that Lurie would have testified that Kamin agreed with Waveland's proposal that all disputes would be decided only in the circuit court and not through any arbitration or quasi-judicial method, and that article 17 was the sole dispute mechanism and was not restricted to disputes that had already gone to the architect for initial decision.

Characterizing Mayfair's declaratory judgment action as a breach of contract dispute, Waveland requested that the jury be instructed as to the elements of breach of contract and as to the meaning of "material breach." It also requested an instruction spelling out to the jury its theory of the case. These proposed jury instructions were denied.

After hearing two weeks of testimony, the jury concluded that Mayfair's interpretation of the contract was correct. The 12 jurors answered "yes" to the following four interrogatories:

"(1) Under the Mayfair-Waveland contract, were the parties required to first submit their disputes to the Architect for decision before being able to assert such disputes in the Circuit Court of Cook County?

(2) Under the Mayfair-Waveland contract, was any decision the Architect rendered on a dispute binding on the parties unless and until the decision was overturned in court?

(3) Did Waveland breach the contract by not allowing the Architect to decide the claims, disputes and other matters in question that Mayfair presented to the Architect for decision?

(4) If Waveland's conduct did constitute a breach, was that breach material?"

In its motion for a new trial, Waveland argued that Mayfair had offered no evidence that it had substantially performed and no evidence that Waveland's conduct constituted a material breach. Waveland also argued that it was entitled to a new trial because of the exclusion of Lurie's testimony. In response, Mayfair argued that given the unusually narrow scope of this declaratory judgment action, only Mayfair's compliance with the construction contract's dispute-resolution provisions was relevant. The court denied Waveland's post-trial motion on August 22, 1991.

On November 25, 1991, the trial court entered a declaratory judgment order reflecting its view of the legal consequences that followed from the jury's factual determinations. The court held that (1) Waveland had breached the contract continuously from November 19, 1985, the date it was signed; (2) Waveland could not assert any defenses or affirmative defenses to Mayfair's claims under the construction contract or to any other claim that was to have been initially decided by the architect; and (3) Mayfair was entitled to terminate the contract on June 22, 1987—the date of the letter from Waveland's attorney to the architect instructing him not to decide any disputes—because Waveland's breach was material, Mayfair had substantially performed its obligations under the contract as of June 22, 1987, and Waveland's breach injured Mayfair. The court did not, however, grant Mayfair's request for a declaration barring Waveland from asserting any *claims* against Mayfair that were to have been decided by the architect.

In mid-December 1991, Mayfair filed in *McHugh* its motion to strike Waveland's affirmative defenses and defenses to Mayfair's claims and to dismiss Waveland's counterclaims. Mayfair contended that the November 25, 1991, order entitled it to a judgment of $8,593,054.11 plus interest and costs. Mayfair filed its notice of cross-appeal in this case on December 19, 1991. Mayfair's motion to strike in *McHugh* was denied without prejudice to Mayfair renewing its motion following exhaustion of all appeals in this declaratory judgment action.

Waveland contends that the trial court's November 25, 1991, order barring it from raising any defenses or affirmative defenses to Mayfair's claims is legally unprecedented and unjustified. After the jury determined that Waveland materially breached the construction contract by refusing to submit disputes to the architect before litigating them in the circuit court, the trial court in paragraph 2 of its order declared:

> "Waveland may not assert any defenses or affirmative defenses to Mayfair's claims under the Mayfair-Waveland contract and Waveland may not assert any defenses or affirmative defenses to any other claim that was subject to being decided by the 3660 Project architect."

In Mayfair's view, this was the only meaningful option that the trial court had as a remedy for Waveland's flagrant disregard of the contract provisions.

Before we address this issue, we must first examine the jury's findings and determine whether they were properly based on the evidence. The jury found that (1) under the construction contract, the

parties were required to first submit their disputes to the architect for decision before being able to assert such disputes in the circuit court; (2) under the construction contract, the decision the architect rendered on a dispute was binding on the parties unless and until the decision was overturned in court; (3) by not allowing the architect to decide the claims, disputes and other matters in question that Mayfair presented to the architect for decision, Waveland breached the contract; and (4) Waveland's breach was material.

Under the general rules of contract construction, contracts are to be interpreted as a whole, giving meaning and effect to each provision of the contract. (*Srivastava v. Russell's Barbeque, Inc.* (1988), 168 Ill. App. 3d 726, 730, 523 N.E.2d 30, 33.) In construing a contract, it is presumed that all provisions were inserted for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions. (*Bruno Benedetti & Sons, Inc. v. O'Malley* (1984), 124 Ill. App. 3d 500, 506, 464 N.E.2d 292, 297.) Applying these rules, we conclude that the jury's interpretation of the construction contract was proper.

Articles 2.2.14, 2.2.15 and 2.2.16 of the general conditions clearly indicate that the parties were required to take their disputes initially to the architect for decision. Article 2.2.14 provides that "the Architect *will* be the interpreter of the requirements of the contract documents and the *initial judge* of the performance thereunder by both the owner and contractor." (Emphasis added.) Article 2.2.15 states that "[c]laims, disputes and other matters in question between the Contractor and Owner *** shall be referred initially to the *architect for decision* ***. Such decision may be litigated by either party." (Emphasis added.) Article 2.2.16 states that "[a]ll interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents." It also refers to the architect as "interpreter and judge." In addition to these provisions, there are several others requiring the architect's decision on a wide variety of matters which arise during construction, including time extensions and amounts paid for change orders, both issues which are disputed here.

■ We reject Waveland's argument that articles 17.1 and 17.2 of the owner-contractor agreement represent the key dispute-resolution provisions of the construction contract and should be read to allow the parties to choose *either* the architect *or* the circuit court as the initial judge of the parties' disputes. Article 17.1 provides that "[n]o decision of the Architect *** which is disputed shall be final; and any such decision shall be subject to determination through litigation."

Since this article speaks of the architect's *decision*, however, this article can only mean that, *after* the architect has ruled, then his decision may be reviewed by a court.

Article 17.2 states that "[a]ny dispute between Owner and Contractor hereunder may be litigated in the Circuit Court of Cook County, Illinois." It also requires the parties to submit to the jurisdiction of the circuit court and to adhere to strict time frames for discovery and litigation of disputes. Were we to accept Waveland's argument—that article 17.2 permits disputes to be litigated at any time, without submitting disputes initially to the architect—then all of the foregoing provisions contained in the general conditions clearly specifying the architect as the initial arbiter of disputes would be rendered meaningless. We think the more sensible reading of article 17.2, when properly viewed in conjunction with the other provisions, is as Mayfair suggests: that once the prerequisite to litigation has been satisfied, *i.e.*, the architect has initially decided the dispute, then the parties may litigate the dispute in the circuit court of Cook County under the time frames specified.

Waveland argues that the introductory language of article 17.2, stated above, makes the construction contract ambiguous. Such construction of the contract, however, violates the maxim that "[t]he intent of the parties must be determined from the contract as a whole and not from any one clause standing alone." (*White v. White* (1978), 62 Ill. App. 3d 375, 378, 378 N.E.2d 1255, 1258.) This court on review may interpret a contract independently of the trial court's judgment. (*Jewel Cos. v. Serfecz* (1991), 220 Ill. App. 3d 543, 548, 581 N.E.2d 186, 189.) In our view, the contract provisions unambiguously required the parties to submit disputes initially to the architect. The general language of article 17.2 does not nullify the explicit mandate of the rest of the contract that disputes "*shall*" be referred initially to the architect for decision.

■ Thus, in response to another of Waveland's contentions, the trial court did not commit reversible error in precluding Lurie from testifying as to his recollection of the contract negotiations he conducted with Kamin. Although the trial court improperly precluded him from testifying on the basis of lack of foundation (see, *e.g., People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848 (the fact that a witness' memory is impaired goes only to the weight and not to the admissibility of testimony, so long as the testimony has some probative value)), in light of our finding that the construction contract was, as a matter of law, unambiguous with respect to the treatment of disputes, the error was harmless.

■ Waveland also argues that, even if it did breach the construction contract by refusing to submit disputes initially to the architect for decision, that breach was not material. The jury, however, found that it was, and we cannot say that this finding was error. The jury heard testimony regarding the importance of quick, binding decisions on disputed issues in order for the work to proceed in a timely manner. The jury also heard testimony that but for the inclusion of the dispute-resolution provisions, Mayfair would never have signed the construction contract. By breaching the contract, Waveland deprived Mayfair of the bargained-for right to quick resolutions by a third party with specialized experience in construction issues, to which the circuit court upon review would have likely given deference.

The flipside of quick resolutions by a neutral third party would be costly and time-consuming litigation of every dispute that could not be resolved by the parties. In addition, as Mayfair points out, since the decisions that the architect was supposed to have made, such as extensions of time and change orders, often were directly related to the amount of money Mayfair would receive during construction, Waveland's refusal to allow the architect to make those decisions necessarily had an immediate financial impact on Mayfair. That the architect's decisions could be reviewed and possibly overturned by the circuit court does not subtract from the fact that Mayfair lost its right to *timely*, binding decisions enabling it to continue working on the project uninterrupted. Had the architect been permitted to decide the disputes relating to construction of the commercial building, for instance, Mayfair may well have completed that portion of the project instead of its former subcontractors.

■ Waveland, however, argues that the trial court erred in refusing to instruct the jury as to the meaning of "material breach" and that, consequently, its finding of material breach cannot stand. Where a trial court refuses to give a tendered instruction, a new trial will be granted only where a party shows that its right to a fair trial has been seriously prejudiced by the denial of the tendered instruction. (*Wade v. City of Chicago Heights* (1991), 216 Ill. App. 3d 418, 423, 575 N.E.2d 1288, 1292.) We cannot conclude that Waveland was seriously prejudiced by the trial court's failure to define for the jury the term "material breach." " '[T]he meaning of words, used in their conventional sense, need not be defined or explained in giving instructions to the jury.' " (*Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 388, 385 N.E.2d 664, 668, quoting *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 323, 211 N.E.2d 247, 252.) This court has defined "material breach" as a failure to do an important or

substantial undertaking set forth in a contract. *Anderson v. Long Grove Country Club Estates, Inc.* (1969), 111 Ill. App. 2d 127, 139, 249 N.E.2d 343, 349.

In addition, Webster's dictionary defines "material" as of real importance or "substantial." (Webster's Third New International Dictionary 1392 (1981).) During closing arguments, the parties both referred to a material breach as an "important" one. As is evident, the conventional or common meaning of "material" is the same as the legal meaning attributed to that word. We are confident, therefore, that the jurors well understood the meaning of "material" without having it defined for them.

Having determined that the jury's factual findings were proper and supported by the evidence, we turn now to the issue of the propriety of the trial court's November 25, 1991, order.

Mayfair filed this action in August 1987, when it became apparent that the architect was not going to resolve any of the disputed issues, primarily involving work on the commercial building. At this point, Mayfair was still the general contractor on the project and remained in that capacity until the spring of 1988. In bringing this action, Mayfair sought a declaration of the rights and obligations of the parties under the construction contract, specifically as they pertained to the resolution of disputes.

Waveland argues that this case should have been dismissed no later than March 1988 when Mayfair stopped working on the project. From that point on, according to Waveland, this case could not serve any of the proper purposes of a declaratory judgment action and could only serve the improper purpose of attempting to resolve issues piecemeal that were properly left for resolution in *McHugh*. We disagree.

Initially, we note that "[t]he granting or denying of declaratory relief rests within the sound discretion of the trial court, and the complaining party on appeal must show affirmatively an abuse of discretion." (*Marlow v. American Suzuki Motor Corp.* (1991), 222 Ill. App. 3d 722, 728, 584 N.E.2d 345, 348-49.) The mere existence of another remedy does not require dismissal of a declaratory judgment action, but it may constitute sufficient grounds for dismissal in the trial court's discretion. *Marlow*, 222 Ill. App. 3d at 728, 584 N.E.2d at 349.

There are two prerequisites for bringing a declaratory judgment action. Under the Illinois declaratory judgment act, there must first be an "actual controversy" (Ill. Rev. Stat. 1987, ch. 110, par. 2—701(a)), which means that there is a "legitimate dispute admitting of

an immediate and definitive determination of the parties' rights which will aid in the termination of the controversy or some part thereof." (*Providence Washington Insurance Co. v. American Bridge Division of United States Steel Corp.* (1990), 200 Ill. App. 3d 597, 600, 558 N.E.2d 396, 397.) The second requirement is that the party bringing the action must be interested in the controversy. Ill. Rev. Stat. 1987, ch. 110, par. 2—701(a); *Providence Washington Insurance*, 200 Ill. App. 3d at 600, 558 N.E.2d at 397.

Both requirements were met in this case. Throughout this litigation, including *after* Mayfair ceased being general contractor on the project, Mayfair and Waveland have disagreed strenuously about the meaning of the construction contract's dispute-resolution provisions, about whether Waveland materially breached those provisions, and about the legal consequences flowing from Waveland's breach. There is no question, then, that an "actual controversy" between the parties exists and that both parties are "interested in the controversy."

Waveland asserts that Mayfair is improperly using this action to obtain a declaration of the legal effects of Waveland's past conduct, so as to later use it to attack Waveland in the *McHugh* litigation. We disagree. It is apparent that Mayfair initially filed this action to determine the construction of the parties' contract, which is a proper objective under the Act. The fact that Mayfair has since ceased being general contractor does not automatically preclude Mayfair from continuing to seek a declaration of the parties' rights and obligations under the contract, even though the past conduct of the parties is now necessarily at issue. The act provides that declaratory relief is proper so long as it "terminate[s] the controversy or some part thereof." (Ill. Rev. Stat. 1987, ch. 110, par. 2—701.) This court in *Marlow* recently held "that the phrase 'some part' of the controversy does not mean an element of a single claim, but, rather, it means an entire claim which is part of more than one claim." (*Marlow*, 222 Ill. App. 3d at 730, 584 N.E.2d at 350.) There, the declaration at issue would not have resolved any claims; instead, it would have established one element of a tort cause of action. Consequently, we held that the trial court did not abuse its discretion in denying declaratory relief, since the declaration would have resulted in piecemeal litigation.

In this case, however, Mayfair sought a declaration that Waveland materially breached the construction contract and as a consequence should be barred in *this* action from asserting any defenses or counterclaims for alleged construction defects and delay. This requested relief, therefore, would dispose of an entire claim and would not result in piecemeal litigation as Waveland argues.

We acknowledge that the trial court's order, if upheld, would have an effect in the *McHugh* case. However, if we determine that the order is proper, it will, in Mayfair's words, "vastly simplify the remainder of the litigation by sharply reducing the number of issues to be decided." While the project may have been completed before the case was given to the jury, the underlying controversy between the parties—whether Waveland can continue to assert its counterclaims and defenses against Mayfair even though it refused to abide by the dispute-resolution procedure that was supposed to have decided those issues—has never become moot.

Waveland contends that there is no authority to support the trial court's selection of a remedy that bars Waveland from asserting any defenses to Mayfair's claims. We note initially that in exercising its discretion to choose an appropriate remedy in a declaratory judgment action, the trial court may grant consequential relief and the court should grant the relief that is necessary and proper for the determination of the controversy before it. (*Vinyard v. Vaught* (1985), 138 Ill. App. 3d 641, 645, 485 N.E.2d 1131, 1134.) Although there does not exist a plethora of authority which is directly on point with the issue before us, nevertheless, we find that there is a sufficient basis in the law to support the trial court's chosen remedy for Waveland's refusal to submit disputes to the architect.

In *Brighton Theatre Co. v. Graf* (1928), 248 Ill. App. 140, a contractor abandoned his work and the owner completed the work in the contractor's place. The parties' contract allowed the owner to finish the work and recover from the contractor the cost of doing the work. The contract also required that the cost incurred by the owner was to be audited and certified by the architect. Each party had a right to appeal the architect's decision. The owner failed to have the architect audit and certify the work and instead sued the contractor to recover the extra costs of completing the job.

On appeal, the contractor argued that the owner was not entitled to a judgment by the court because the owner did not comply with the provision of the contract requiring certification by the architect. The court agreed, holding that the owner's failure to submit its expenses to the architect for determination initially, prior to filing suit, barred the owner from suing under the contract for those expenses.

In a case involving parallel facts, our supreme court reached the same conclusion. (See *International Cement Co. v. Beifeld* (1898), 173 Ill. 179, 50 N.E. 716.) The court determined that submitting expenses to the architect for certification was a condition precedent to litigating those claims in court.

Likewise, in this case, submission of the parties' disputes to the architect was a condition precedent to litigating them in the circuit court, as the jury so found. As in *Brighton* and *Beifeld*, Waveland refused to fulfill this condition, and the trial court, therefore, declared, as a proper remedy for Mayfair, that Waveland may not now assert defenses and affirmative defenses against claims raised by Mayfair that should have been initially decided by the architect but were not.

In *Hill v. Mercury Record Corp.* (1960), 26 Ill. App. 2d 350, 356, 168 N.E.2d 461, 465, this court stated that "a binding agreement relating to future controversies may be made requiring that the determination of some fact be made by arbitrators or appraisers as a condition precedent to the bringing of a suit." However, in order to prevent resort to litigation, "such a provision must make such arbitration a condition precedent to the right of action either expressly or by clear implication, and *** if this is not done, the arbitration provision *** cannot be pleaded in bar to an action on the principal contract." (*Hill*, 26 Ill. App. 2d at 356, 168 N.E.2d at 465.) Implicit in the above language is the fact that if a provision creating a condition precedent to litigation is shown, a party refusing to comply with it may be barred from pursuing claims in court. See also 6 C.J.S. *Arbitration* §28 (1975) (stating the rule that where submission of a dispute to an arbitrator is made a condition precedent to litigation of that dispute, that provision must be complied with *before* an action may be brought on the contract).

There is no doubt that the construction contract in this case required submission of the parties' disputes to the architect as a condition precedent to litigating those disputes. Waveland failed to fulfill this condition. As the foregoing makes clear, such a failure can result in a complete bar to the right of a party to bring an action to litigate its contractual claims. We see no reason why that party, which willingly refused to abide by the contract's dispute-resolution mechanism, should not similarly lose its right to defend against claims asserted against it.

Waveland argues that *Brighton* and *Beifeld* have "dubious precedential value" because they were decided long ago. On the contrary, merely because a case is old does not necessarily mean it is no longer good authority. (See *Kazale v. Flowers* (1989), 185 Ill. App. 3d 224, 228, 541 N.E.2d 219, 222.) Indeed, we have found nothing in our research to indicate that these cases have been overturned by later courts. Thus, in our view, these cases remain good authority.

Moreover, in a more recent case, *Ramonas v. Kerelis* (1968), 102 Ill. App. 2d 262, 243 N.E.2d 711, this court held that the defendants lost their right to present their defense where they voluntarily chose not to appear before the arbitrator deciding the parties' dispute. The court stated that the defendants "had their opportunity to present their contentions and arguments to the arbitrator but voluntarily chose not to do so. *** In refusing to appear, both defendants acted at their own peril ***" in losing their right to defend. (102 Ill. App. 2d at 273.) Here, Waveland had its opportunity to present its defenses to the claims Mayfair had requested the architect to decide. By its own action barring the architect from deciding Mayfair's claims, it cannot now be heard to complain that it was wrongly deprived of its right to defend against Mayfair's claims.

Waveland also argues that the relief awarded Mayfair in the November 25, 1991, order gives Mayfair a "total victory" on its contract claims even though Mayfair may not have prevailed on those claims had the "architect-submittal procedure" been practiced. Waveland, however, is mistaken. As Mayfair points out, it did not request, and the trial court did not grant, automatic liability on its claims. There is no conclusive presumption of liability on the part of Waveland for its potential obligations under the contract. Rather, Mayfair will still be required to prove its claims, as the plaintiffs in *Ramonas* had to prove their claims and damages when the defendants lost their right to present defenses by failing to appear before the arbitrator. The fact finder will be entitled to accept or reject the evidence put forth by Mayfair in support of its claims and award damages, if any, accordingly.

In addition, Waveland asserts that the order violates the principle of contracts, that a plaintiff is only entitled to be placed in as good a position as he would have been in had the contract been performed. In Waveland's view, the order grants Mayfair a windfall and works a "great unfairness" upon Waveland. It is difficult, if not impossible, to determine at this juncture how the parties would have ended up had Waveland adhered to the contract and submitted the parties' disputes to the architect for decision. It is conceivable indeed that the parties would have abided by the architect's determinations and avoided litigation altogether. Waveland suggests that the more appropriate remedy is to require Mayfair to sue Waveland for money damages in a breach of contract action. We disagree because the damages would be difficult to quantify and could potentially lead to years of additional litigation.

We disagree also with requiring the parties to now submit their disputes to the architect. At this stage, the architect can hardly be characterized as a neutral third party capable of rendering objective decisions. Indeed, in its June 1987 letter to the architect, Waveland threatened to fire the architect and sue him if he issued any decisions relating to the parties' disputes. In addition, as Mayfair points out in its brief, after this action began, the architect filed his own action against Waveland for nonpayment of fees. Moreover, had the trial court ordered resolution of disputes by the architect as a remedy, Waveland would, as Mayfair correctly suggests, have succeeded in its attempt to delay complying with its contractual obligations at no harm to itself while Mayfair would have lost entirely the benefit from the contract's provisions requiring a prompt resolution of disputes.

Waveland also argues that several portions of the order have no factual basis and therefore cannot stand. Initially, Waveland points out that the jury did not specifically find that Waveland breached the construction contract "continuously from November 19, 1985," the date the contract was signed, as the trial court stated in its order. We agree. The jury determined that Waveland breached the contract "by not allowing the architect to decide the claims, disputes and other matters in question that Mayfair presented to the architect for decision." Our review of the record clearly shows that the affirmative act of "not allowing" the architect to decide disputes occurred on June 22, 1987, the date Waveland's attorney sent a letter to the architect threatening to terminate and to sue him if he decided any disputes. Therefore, June 22, 1987, and not November 19, 1985, in our view, is the date of breach that is in keeping with the jury's findings.

Waveland also asserts that the trial court erred in finding that Mayfair substantially performed its contractual obligations. We agree with Waveland that the trial court erred in so finding since the jury heard no evidence on this issue. Mayfair, likewise, concedes this error. However, since this is not a traditional breach of contract action but, rather, is an action to determine the consequences of Waveland's refusal to follow the contract's dispute-resolution provisions, the issue of substantial performance by the party bringing the action—Mayfair—is irrelevant to our determination of whether the remedy afforded Mayfair was proper. In *Brighton* and *Beifeld*, for instance, the court held that the plaintiff's claims were barred because they had refused to abide by the dispute-resolution provisions of their respective contracts, even though the other party had abandoned the job and, therefore, could not have substantially completed the work.

Thus, in response to another issue raised by Waveland, once it became evident to Mayfair on June 22, 1987, that Waveland was not going to adhere to the contract's dispute-resolution provisions by submitting the parties' disputes initially to the architect—which the jury determined was a material breach—Mayfair was entitled to terminate the contract. Under the circumstances in this case, Mayfair was not required to first prove that it had substantially performed and that Waveland committed the first breach before it could terminate the contract. The reason is clear: Waveland avoided the very mechanism (dispute resolution initially by the architect) which would have determined whether the parties had substantially performed or whether one or the other had breached the contract. Waveland may not now argue in the circuit court that Mayfair breached first or that it did not substantially perform in an effort to prove that the remedy contained in the order was improper.

Since we have determined that the order precluding Waveland from asserting any defenses or affirmative defenses to the claims of Mayfair which should have been initially decided by the architect was proper, we necessarily find, in response to Mayfair's cross-appeal, that Waveland is also precluded from asserting any counterclaims against Mayfair that could and should have been properly brought to the architect initially. The same authority and reasoning which support the preclusion of Waveland's defenses apply with full force to the preclusion of Waveland's counterclaims.

In this regard, we note that there is considerable disagreement between the parties as to whether certain of Waveland's counterclaims (such as those pertaining to the HVAC system, corridor carpeting, and punch list work) were in fact submitted to the architect for decision and ruled on by him, thus satisfying the condition precedent to litigation. This is an issue properly before the trier of fact and is not for this court to decide. On remand, the trier of fact will be required to determine initially which, if any, of Waveland's counterclaims were ruled on by the architect as a precondition to litigation. Any such counterclaims may properly be asserted against Mayfair. All others are barred.

As a final matter, although Waveland's defenses and affirmative defenses are barred, Mayfair will still be required to present evidence in support of its claims before damages, if any, may be recovered from Waveland.

For the foregoing reasons, we affirm the order of the circuit court of Cook County barring Waveland from asserting any defenses or affirmative defenses to Mayfair's claims which under the construction

contract should have been decided by the project architect. We reverse the judgment of the circuit court denying Mayfair's request to bar Waveland from asserting counterclaims against Mayfair which should also have been, but were not, decided by the architect and remand for entry of an order barring such counterclaims and for further proceedings consistent with this opinion.

Affirmed in part; reversed and remanded in part.

EGAN and RAKOWSKI, JJ., concur.